# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

### Appeal No. 13-1346

---

### UNITED STATES OF AMERICA
### Appellee

### v.

### FRANCISCO MERCEDES,
### Defendant-Appellant

---

### Supplemental Brief for the Defendant/Appellant on Appeal from the
### United States District Court for the District of Puerto Rico

---

**George F. Gormley**
**B.B.O. No. 204140/ App. No. 11595**
**Stephen Super**
**B.B.O. No. 655943**
**Attorneys for the Appellant**
**George F. Gormley, P.C.**
**755 East Broadway**
**South Boston, MA 02217**
**(617)-268-2999**

## <u>TABLE OF CONTENTS</u>

SUPPLEMENTAL STATEMENT OF CASE .........................................................1

ARGUMENT ......................................................................................................9

I. **THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING AN UNJUST AND SUBSTANTIVELY UNREASONABLE SENTENCE ON APPELLANT THAT PUNISHED FAR MORE THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING** ............9

    A.    THE DISTRICT COURT IMPROPERLY CALCULATED THE GSR REGARDING DRUG QUANTITY, IN BOTH THE TOTAL INVOLVED IN THIS CASE AND HOW MUCH WAS REASONABLY FORESEEABLE TO APPELLANT .........................................................................................10

        1.    The Government's Sentencing Entrapment Conduct Improperly Inflated The Drug Quantity Applicable To This Case ......................................................................11

        2.    The District Court Made A Conspiracy-Wide Determination That Held Appellant Responsible For A Higher Drug Quantity Was Reasonably Foreseeable To Him ..............................................................................17

    B.    APPELLANT PLAYED A MINOR ROLE IN THE CONSPIRACY AND SHOULD HAVE BEEN AWARDED A TWO-LEVEL REDUCTION UNDER THE SENTENCING GUIDELINES...................................................................23

    C.    A SENTENCE IN EXCESS OF 12 AND A HALF YEARS FOR A ONE-TIME, NON-VIOLENT OFFENSE OF TRANSPORTING MONEY FOR CONTRABAND IS NOT A JUST PUNISHMENT ...............................................27

CONCLUSION .....................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................37

CERTIFICATE OF SERVICE ................................................................38

## TABLE OF AUTHORITIES

### CASES
### Supreme Court

Alleyne v. United States, 133 S. Ct. 2151 (2013)....................................34

Gall v. United States, 552 U.S. 38 (2007) ...............................9, 10, 28, 29

Kimbrough v. United States, 128 S. Ct. 558 (2007)................................23

Nelson v. United States, 129 S. Ct. 890 (2009) ........................................9

### First Circuit

United States v. Arango, 508 F.3d 34 (1st Cir. 2007) ..........................29, 30, 31, 33

United States v. Cintrón-Echautegui, 604 F.3d 1 (1st Cir. 2010)...............10, 11, 19

United States v. Colon-Solis, 354 F. 3d 101 (1st Cir. 2004) ...................................19

United States v. Cortes-Caban, 691 F. 3d 1 (1st Cir. 2012) .............................18, 21

United States v. DePierre, 599 F.3d 25 (1st Cir. 2010)...........................................12

United States v. Donovan, 996 F.2d 1343 (1st Cir. 1993).......................................34

United States v. Flores-Machicote, 706 F.3d 16 (1st Cir. 2013)......................10, 28

United States v. Fontes, 415 F.3d 174 (1st Cir. 2005)..............................................12

United States v. Gilman, 478 F.3d 440 (1st Cir. 2007) ...........................................30

United States v. González-Vélez, 587 F.3d 494 (1st Cir. 2009) .............................18

United States v. Jaca-Nazario, 521 F.3d 50 (1st Cir. 2008) .....................................12

United States v. King, 741 F.3d 305 (1st. Cir. 2014) .........................................9, 10

United States v. Martin, 520 F.3d 87 (1st Cir. 2008) .........................................9, 28

United States v. Martinez-Vargas, 321 F.3d 245 (1st Cir. 2003) ...........................24

United States v. Morales-Machuca, 546 F.3d 13 (1st Cir. 2008) ...........................24

United States v. Navedo-Concepción, 450 F.3d 54 (1st Cir. 2006) .......................28

United States v. Ocasio, 914 F.2d 330 (1st Cir. 1990) ..........................................24

United States v. Pena, 742 F.3d 508 (1st Cir. 2014) ...............................................34

United States v. Rivera-Gonzalez, 626 F.3d 639 (1st Cir. 2010) ...........................10

United States v. Rosa-Carino, 615 F.3d 75 (1st Cir. 2010) ....................................27

United States v. Rosado-Sierra, 938 F.2d 1 (1st Cir. 1991) ...................................27

United States v. Sanchez, 354 F.3d 70 (1st Cir. 2004)...........................................23

United States v. Santos, 357 F.3d 136 (1st Cir. 2004).......................................18, 26

United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993)......................................11

United States v. Teeter, 257 F.3d 14 (1st Cir. 2001) ..............................................24

United States v. Turbides-Leonardo, 468 F.3d 34 (1st Cir. 2006) ...................28, 29

West v. United States, 631 F.3d 563 (1st Cir. 2011) ............................10, 12, 15, 27

## Other Circuits

United States v. Grier, 475 F.3d 556 (3d Cir. 2007) ................................................30

United States v. Staufer, 38 F. 3d 1103 (9th Cir. 1994) .........................................13

United States v. Stavig, 80 F.3d 1241 (8th Cir. 1996)..............................................12

United States v. Stuart, 923 F.2d 607 (9th Cir. 1991) .............................................12

## District Court

Holloway v. United States, 01-CV-1017 (E.D.N.Y. July 25, 2014) ................32, 34

United States v. Cabrera, 567 F. Supp. 2d 271 (D. Mass. 2008)............................27

United States v. Jurado-Lopez, 338 F. Supp. 2d 246 (D. Mass. 2004) ............25, 27

United States v. Lora, 129 F. Supp. 2d 77 (D. Mass. 2001)..............................14, 16

United States v. Martinez, 2007 WL 593629 (D. Kan. Feb. 21, 2007)...................29

United States v. Panduro, 152 F. Supp. 2d 398 (S.D.N.Y. 2001) ....................14, 15

United States v. Ruiz, 2006 WL 1311982 (S.D.N.Y. May 10, 2006)....................30

United States v. Towne, 705 F. Supp.2d 125 (D. Mass. 2010) ...............................12

## STATUTES

18 U.S.C. § 3553, et seq................................................... 9, 10, 21, 28, 29, 30, 31, 36

21 U.S.C. § 846..........................................................................................................1

21 U.S.C. § 853........................................................................................................26

## <u>RULES AND GUIDELINES</u>

U.S.S.G. § 1B1, *et seq.* ..............................................................................18

U.S.S.G. § 2D1.1, *et seq.* ...............................................................13, 16, 35

U.S.S.G. § 3B1.2, *et seq.* ...................................................................23, 24

U.S.S.G. § 3E1.1, *et seq.*...................................................................6, 32, 33

## <u>SUPPLEMENTAL STATEMENT OF CASE</u>

This brief is a supplement to the opening brief Francisco Mercedes ("Appellant") filed in this matter on April 15, 2014.  A comprehensive fact summary was provided in that brief, and unless otherwise noted any additional facts in this brief are included because they were either initially omitted or because their inclusion will help clarify the issues on appeal.

Appellant was charged and convicted of one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine, and one count of attempting to possess with intent to distribute five kilograms or more of cocaine, both in violation of 21 U.S.C. § 846.  As Appellant previously stated, he was not the target of the government's investigation that led to his indictment.  The government, through an undercover operation by the Department of Homeland Security, was investigating the money laundering and drug trafficking activities of Pedro Hernández-Ubiera, Benigno Hernández-Clander and José Decena-Mendieta.  Presentence Report ("PSR"), ¶ 5.

There is no evidence on the record indicating Appellant's participation any earlier in the conspiracy than May 2, 2012, the night before he was arrested, when the government claimed he counted, or helped count with the other defendants, $170,000 in cash.  His only proven involvement on the record was separately

arriving with the money on May 3, 2012, at a Costco parking lot in Carolina, Puerto Rico, where undercover agents had arranged a "reverse sting" sale of cocaine with Hernández-Clander (PSR ¶¶ 8, 11).[1]  Appellant was arrested along with the other three defendants named above (PSR ¶ 13).  Hernández-Ubiera attempted to flee arrest by running into the Costco store, where he also tried to throw away three cell phones and destroy another.  Id.

No evidence was presented on the record that Appellant was aware of the specific negotiations between Hernández-Clander and the agents, *i.e.*, that the money was apparently a down payment for a larger amount of cocaine – 100 kilograms ("kilos") – or that the cash payment he transported was actually $20,000 less than the original agreed-upon amount.  The government had negotiated a price of $19,000 per kilo, and apparently offered to provide 100 kilos for a down payment of ten percent (PSR ¶ 6).  However, it reduced the price of the transaction when it was clear the defendants had no capacity to provide $190,000 (PSR ¶ 7).  Aside from counting and transporting the money, the only additional evidence the government offered specific to Appellant's role was that he made an offhanded comment to an undercover agent in the parking lot regarding how difficult it was to

---

[1] The agents showed Hernández-Clander bags of what appeared to be cocaine, but were actually filled with fake or "sham" cocaine (PSR ¶ 9).

gather $170,000 (PSR ¶ 11).

Only three of the four men detained that day were indicted: Appellant, Hernández-Ubiera and Hernández-Clander.  Decena-Mendieta, a known drug trafficker and an identified target of the sting, who drove Hernández-Ubiera to the parking lot (PSR ¶ 12) and would normally be considered under these circumstances to be a full conspirator in the offense, was dismissed from the case on motion from the government, "in the interests of justice."  <u>See</u> Motion to Dismiss Complaint Against [4] Jose Decena-Mendieta Without Prejudice,[2] filed May 30, 2012, at 1 (S.A. 28).[3]  The indictment against the remaining three defendants was entered on May 31, 2012 (Dkt. 42).  Appellant, who posted bond shortly after the complaint was issued, was not considered a flight risk or a danger to the community and remained free on bond for most of the time prior to resolution of his case.

The magistrate court initially ordered all discovery released to the defendants by July 29, 2012, and scheduled the trial for August 13, 2012 (Dkt. 54). Only a few days after all the discovery was released, the government sent all

_____

[2] The motion was filed in 12-mj-00684-CVR, the magistrate-level case which initially involved all four defendants.  The motion was allowed the next day, May 31, 2012 (Dkt. 39).

[3] Appellant will reference materials in the supplemental appendix as "(S.A. __)."

3

defense counsel an email on the afternoon of August 1, 2012, which gave the

defendants less than 12 hours to accept a standing offer to recommend a term of 70

months for a guilty plea, or it would be increased at midnight, August 2, 2012, to

82 months.  See United States' Response to Informative Motion and Motion for

Cooler Heads, filed September 10, 2012, at Exhibit 1 (S.A. 24).  Further, the

government warned that if the deal was not accepted then, the prison term

recommendation would be increased the next day, August 3, 2012, to 94 months.

Id.  If the offer was not accepted by midnight on that day, all plea offers would be

withdrawn.  Id.

It is unclear whether Appellant's trial-level counsel received and/or read this

email, as he filed a motion with the district court on September 9, 2012, claiming

that he had been "blindsided" by the government's termination of what had been

ongoing, good-faith plea negotiations.  See Motion Requesting Cooler Heads to

Prevail, filed September 9, 2012, at 1 (S.A. 22).  It is also unclear whether counsel

was able to relay any of the government's high pressure warnings regarding its

plea offer to Appellant in a timely fashion.

Despite filing the motion, which was Appellant's effort to bring the

government "back to the table" and resolve the case without need for trial, the

government refused to resume plea negotiations or entertain any new offers from

4

Appellant (or from either of the other two defendants).  The government

compounded the difficulties surrounding this case by inexplicably rotating its

assistants.  On August 6, 2012, AUSA Martin, the government's initial attorney,

moved to continue the trial to September 10, 2012 (Dkt. 74), a motion which was

granted (Dkt. 75).  On August 21, 2012, a new attorney for the government, AUSA

Longo Quinones, appeared (Dkt. 81), and moved to continue the trial beyond

September (Dkt. 82).  The court denied that motion, stating that if the government

knew the new AUSA would not be ready for the scheduled trial "it should not have

assigned the case to her." (Dkt. 83).  Later on the same day, the government added

another new representative to the case, AUSA Henwood (Dkt. 84).

This inconsistency of representation, along with the very brief time counsel

was afforded to analyze the discovery and assess the strength of the case against

his client aggravated Appellant's inability to achieve any progress with the

government on the plea issue.[4]  Unwilling to take his case to trial, commencement

of which was imminent, Appellant pleaded guilty on September 10, 2012.  At the

change of plea hearing, Appellant reserved his right to dispute at sentencing that

---

[4] The record indicates the discovery contained a number of surveillance videos as
well as audio surveillance recordings and corresponding transcripts of at least 26
phone calls between the agents and defendants (not including Appellant), in
addition to numerous law enforcement reports.  See P.Tr. 13 (S.A. 6).

the drug quantity of 100 kilos of ersatz cocaine was attributable to him.  See Plea

Hearing Transcript ("P.Tr."), Sept. 10, 2012, at 51 (S.A. 9).  When the

government's attorney read the case summary in open court, she described the

$170,000 as a "down payment," and at no time did she describe it as going toward

transportation costs.  See id. at 49 (S.A. 7).

    Following release of Appellant's PSR – which held Appellant responsible

for the full 100 kilogram amount – the government showed its resolve to see the

highest guidelines sentences meted out for this offense by objecting to the

Probation Office's finding that Appellant should receive a three level-reduction for

accepting responsibility, stating that because he had not pleaded guilty prior to the

scheduled trial date he was only entitled to a two-level reduction, under U.S.S.G. §

3E1.1(a), and not three levels under U.S.S.G. § 3E1.1(b).  See Addendum to the

Presentence Report at 1.  The Probation Office agreed and adjusted Appellant's

total offense level upward.

    At sentencing on February 27, 2013, the district court heard an argument

from the government that Appellant was not a minimal participant because he

counted and transported the money.  See Sentencing Hearing Transcript ("S.Tr."),

February 27, 2013, at 3-4 (S.A. 14-15).  Following the government's presentation,

the court told Appellant's counsel, "He doesn't appear in the video, but [the

government] says that the night before he was counting the money." S.Tr. at 5

(S.A. 16). Counsel countered by noting that the investigation went on for weeks

but Appellant did not appear until the very end. See id.

During the allocution, which occurred immediately after, Appellant stated:

> "It's something that they always use in my work, but I
> have never spoken about drugs and I have never spoke
> about any drugs, and I have never traffic drugs. I have
> not been close to drugs. Yes, they did use me. But I
> would not have let myself to destroy my life for all the
> money in the world. And I didn't know what I signed
> either.

Id.

In determining that Appellant's base offense level was 36, the district court

stated, "Because Mr. Mercedes has been held responsible for conspiring to attempt

to possess with intent to distribute and aiding and abetting others to attempt to

possess with distribute 100 kilos of cocaine." S.Tr. at 6-7 (S.A. 17-18). The

district court then imposed a straight guidelines sentence of 151 months. S.Tr. 8

(S.A. 19). Appellant addressed the court after sentence was pronounced, stating,

"That the guilt is for my crime, not the guilt for the drugs. I am not going to plead

guilty of buying 100 kilos of drugs if I never talk about drugs." S.Tr. at 9 (S.A.

20). The court responded, "Well, that's what you pled guilty to." Id.

Hernández-Ubiera, who tried to avoid arrest and destroy evidence, was

7

given the same 151 month sentence on the same day (Dkt. 178).  A few weeks later, the district court sentenced Hernández-Clander to a higher term, 188 months, pursuant to its finding that he was the leader of the conspiracy (Dkt. 190).

Prior to his arrest, Appellant was earning up to $1,200 per month as a taxi driver (PSR ¶ 46), with monthly expenses of well over $2,000 per month (PSR ¶ 49).  The Probation Office determined he owed over $12,000 in various debts, none of which he appeared to be paying back (PSR ¶¶ 48, 50).

## ARGUMENT

**I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING AN UNJUST AND SUBSTANTIVELY UNREASONABLE SENTENCE ON APPELLANT THAT PUNISHED FAR MORE THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING.**

Under 18 U.S.C. § 3553(a)(2)(A), a judge must consider "the need for the sentence imposed...to reflect the seriousness of the offense, to promote respect for the law, and to provide **just punishment for the offense**." Id. (emphasis added). The 151-month term imposed here is not a just punishment, as it subjects Appellant to an excessive incarceration that does not reflect the circumstances of the offense and the role Appellant played. It punishes far "greater than necessary to accomplish the goals of sentencing." United States v. King, 741 F.3d 305, 309 (1st. Cir. 2014) (quoting 18 U.S.C. § 3553(a)).

Although the 151-month term is within the advisory guidelines sentencing range ("GSR") of 151-188 months, it is not presumptively reasonable. See Nelson v. United States, 129 S. Ct. 890, 892 (2009); Gall v. United States, 552 U.S. 38, 51 (2007) (sentencing courts "may not presume that the Guidelines range is reasonable."). The "linchpin" of this Court's substantive reasonableness review is whether the sentence reflects "a plausible ... rationale and a defensible result." King, 741 F.3d at 308; (quoting United States v. Martin, 520 F.3d 87, 96 (1st Cir.

2008)).  As this Court will not substitute its own judgment for a district court's discretion, the review is limited to whether the sentence is reasonable "in light of the totality of the circumstances." Gall, 552 U.S. at 51; King, *supra* at 308.

This Court's review "for reasonableness is a two-step process." West v. United States, 631 F.3d 563, 572 (1st Cir. 2011); United States v. Rivera-Gonzalez, 626 F.3d 639, 646 (1st Cir. 2010).  First, this Court examines whether the sentencing court committed a procedural error, which includes improperly calculating the GSR, and sentencing on erroneous facts.  See Gall, 552 U.S. at 51.[5] If no procedural error is found this Court then evaluates the sentence for "its substantive reasonableness."  United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

A.    THE DISTRICT COURT IMPROPERLY CALCULATED THE GSR REGARDING DRUG QUANTITY, IN BOTH THE TOTAL INVOLVED IN THIS CASE AND HOW MUCH WAS REASONABLY FORESEEABLE TO APPELLANT.

Appellant's excessively high GSR was driven entirely by drug quantity, as he had no criminal history points, did not use or possess a weapon in committing the offense, and played no enhanced role.  See United States v. Cintrón-

---

[5] Gall's list of procedural errors also includes "treating the Guidelines as mandatory…failing to consider the [18 U.S.C.] § 3553(a) factors…or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." Id. at 51.

Echautegui, 604 F.3d 1, 5 (1st Cir. 2010) (drug case sentence "largely driven" by drug quantity and type) (citing United States v. Sepulveda, 15 F.3d 1161, 1196-97 (1st Cir. 1993)).  Through a reverse sting, the government negotiated the sale of 100 kilos of cocaine directly with Hernández-Clander, a whopping amount for which neither he nor his co-conspirators Hernández-Ubiera and José Decena-Mendieta showed any apparent ability to afford or distribute.  Appellant's limited role as a money counter and transporter does not suggest direct knowledge of the negotiations, particularly as the amount he brought to the reverse sting was $170,000, a substantial figure but not enough to purchase even one-tenth of the staggering 100 kilo total the government agents suggested to Hernández-Clander.

>    1.    The Government's Sentencing Entrapment Conduct Improperly Inflated The Drug Quantity Applicable To This Case.

Of course, the 100 kilos was only a government fabrication, an entrapment fantasy the agents produced even without the aid of the sham cocaine.  It may as well have been a zillion kilos, as it was simply a number the government pulled out of the air and threw out over the telephone.  Whether 100 kilos was the amount which Hernández-Clander actually agreed to, neither he nor the other two targets of the investigation had the money to purchase that much cocaine and certainly gave no other indication they had the capacity to possess and distribute it.

In a sentencing entrapment case, the government attempts to buy or sell

11

excessive drug quantities from a suspect in order to inflate his potential sentence. West, 631 F.3d at 570, United States v. DePierre, 599 F.3d 25, 28-29 (1st Cir. 2010); see also, *e.g*., United States v. Fontes, 415 F.3d 174, 180-182 (1st Cir. 2005). The impropriety occurs when "a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." United States v. Stuart, 923 F.2d 607, 614 (9th Cir. 1991), *cert. denied,* 499 U.S. 967 (1991) (confirming the elements of entrapment but finding none in the case at bar).

Although this Court often uses the terms "sentencing factor manipulation" and "sentencing entrapment" interchangeably, DePierre, 599 F.3d at n.2 (citing United States v. Jaca-Nazario, 521 F.3d 50, 57 (1st Cir. 2008)), entrapment cases more often involve reverse stings in which the government tries "inducing a defendant disposed to commit a lesser crime into committing a greater one of the same general character." United States v. Towne, 705 F. Supp.2d 125, 138 n. 17 (D. Mass. 2010). As this case illustrates reverse sting operations have a high misconduct potential, as they can greatly tempt the government to try to "shoot the moon" and elicit a far higher sentence than would be warranted in a particular case. See United States v. Stavig, 80 F.3d 1241, 1247 (8th Cir. 1996) (reverse sting cases require "the most careful scrutiny and a probing examination by the district

12

court").

The advisory sentencing guidelines allows a departure in these cases, as an acknowledgment that a reverse sting operation can often induce a defendant into purchasing far more drugs than originally intended through an overly generous pricing arrangement.  See United States v. Staufer, 38 F. 3d 1103, 1107 (9th Cir. 1994) (" [T]he Sentencing Commission now expressly recognizes that law enforcement agents should not be allowed to structure sting operations in such a way as to maximize the sentences imposed on defendants…").  Specifically, the guidelines application note states in relevant part:

> If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

U.S.S.G. § 2D1.1, Application Note 26(A) (2012).

The same improper inducement occurs in cases such as this one involving a consignment, i.e., where the government offers credit terms substantially more generous than the market would normally provide in order to goad the defendant

into purchasing more drugs than he would have otherwise. United States v. Panduro, 152 F. Supp. 2d 398, 403-404 (S.D.N.Y. 2001). "The relevant question, then, is not simply whether the price per kilogram was artificially low, but whether the government's financial terms in general were artificially generous, or otherwise unrepresentative of market practices." United States v. Lora, 129 F. Supp. 2d 77, 92 (D. Mass. 2001).

The government's initial offer to provide 100 kilos of cocaine for only a ten percent down payment was already suspect, as this was far beyond what would normally be offered by a seller with little or no history of doing business with the buyer. But as the defendants had no capacity to raise the ten percent amount, $190,000, the government apparently revised its proposition to Hernández-Clander, offering to give the 100 kilos in exchange for the $170,000 the defendants did manage to raise (a figure less than nine percent of the overall price).

In the similar Panduro case, the government's imaginary cocaine amount was far less – 35 kilos – and its down payment demand was far higher – half of the total purchase price – than what is at issue here. See Panduro, 152 F. Supp. 2d at 407. The district court acknowledged that drugs are sometimes purchased on credit with a down payment, id., but noted that consideration for the deal was nonexistent. Id. The undercover agent had not met the defendants prior to the

14

operation, and he knew almost nothing about their capacity and ability to move the kilos. See id. The court reasoned that in a down payment deal, "there is generally some assurance that payment will be made. Such indicia include a pre-existing business relationship or a detailed understanding of the purchaser's drug distribution network. Here, there are neither." Id.

In Appellant's case, there is nothing on record regarding a preexisting business relationship. The PSR merely states that the agents were investigating three suspects (not including Appellant), and that they "initiated telephone conversations" with Hernández-Clander to get the reverse sting rolling (PSR ¶ 5). The PSR also implies that nothing was said about assurances; the government simply negotiated selling $1.9 million worth of cocaine for only a ten percent payment upfront, with no apparent collateral or consideration for the deal, and no terms of interest (PSR ¶ 6). Under almost identical circumstances, the Panduro court found that "an extension of credit for 50 percent of the purchase price is both unreasonable and below market," prompting it to award a departure under the guidelines. Panduro, 152 F. Supp. 2d at 407.

By a preponderance of the evidence, the government here engaged in improper sentencing factor manipulation. West, 631 F.3d at 570. It was error for the district court to apply the 100 kilo quantity to this case, as the defendants

15

clearly could not front the cash to purchase even ten percent of the total, and made no assurances that they could sell that amount and repay the outstanding $1.73 million.  The most equitable remedy would be to remand for sentencing based on the actual cocaine amount the defendants could afford, 8.9 kilos.  At the very least, Appellant must be afforded a two-level downward departure, pursuant to U.S.S.G. § 2D1.1, Application Note 26(A), as the government offered a below market price deal with substantially generous credit terms to induce the other defendants to attempt to buy more cocaine than their resources would normally have allowed. See Lora, 129 F. Supp. 2d at 91 (describing two-prong test for applying guidelines departure).

The government has tried to circumvent the quantity issue by offering the bizarre alternative theory that the $170,000 was not a down payment at all – contradicting its own offense conduct summary in the PSR – but rather was meant for "transportation costs."  The government first made this argument on the record at sentencing, see S.Tr. at 4 (S.A. 15), and then repeated it twice in its brief to this Court.  Gov't Brief, at 9, 27.

The government's theory twists logic and common sense by implying that that instead of Appellant bringing only enough cash to purchase – at the negotiated price of $19,000 per kilo – 8.9 kilos, a cocaine amount that much more accurately

represents the defendants' ability and predisposition to possess and distribute, what he actually brought to the scene was the money needed to pay for *transporting* the entire 100 kilo amount. The problem with that argument, of course, is that the government showed up with the (sham) cocaine, claiming it was the full 100 kilos, in what the PSR described only as "a vehicle" (PSR ¶ 9). Unless that "vehicle" was the U.S. Space Shuttle Endeavour and not an ordinary automobile or van, it is very unclear why $170,000 was needed to cover transportation costs.

As any drug enforcement agent can attest, including those used as expert witnesses by the government in criminal trials, drug dealers do not make a habit of separately charging for transportation costs as a line item expense, any more than they would insist on charging the applicable sales tax. The $170,000 was to pay for cocaine, just as Hernández-Clander and Hernández-Ubiera intended and the government initially claimed. The specious "transportation costs" argument was invented in the eleventh hour as a new way to tie all 100 kilos to Appellant. It is unsupported by the record and should be given no consideration by this Court.

   2.   The District Court Made A Conspiracy-Wide Determination
        That Held Appellant Responsible For A Higher Drug Quantity
        Than Was Reasonably Foreseeable To Him.

Under the advisory sentencing guidelines, the drug quantity attributable to a defendant "is based on both the charged conduct and the relevant uncharged

17

conduct.  United States v. Cortes-Caban, 691 F. 3d 1, 26-27 (1st Cir. 2012); United States v. González-Vélez, 587 F.3d 494, 508 (1st Cir. 2009); see also U.S.S.G. § 1B1.1 cmt. n. 1(H) (defining the term "[o]ffense" as including "the offense of conviction and all relevant conduct under § 1B1.3").  The charged conduct here specifies only a (relatively) small amount of drugs, as Appellant was indicted for being in a conspiracy which tried to possess, with an intent to distribute, five or more kilograms of cocaine.  Relevant conduct, on the other hand, includes, "in the case of a jointly undertaken criminal activity...all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

In a drug conspiracy, therefore, a co-conspirator is only responsible "for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." Cortes-Caban, 691 F. 3d at 27 (quoting United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004)).  As Appellant argues below, see infra Section B, he clearly played a lesser role in the offense than his co-defendants. That he brought the money to the arranged meeting place is not in dispute. However, he was not a target of the investigation and there is no evidence on the record that he joined the conspiracy any earlier than the night before the arrests,

when he was said to have counted the money.  Certainly, there is no evidence on the record that he actively did anything to advance the conspiracy before then.

There is also no mention of Appellant by the agents or the other defendants in any of the filed reports, prior to the actual arrest report, or in the recorded surveillance.  Therefore, there is no evidence he was an ongoing partner who would have remained with the conspiracy beyond the point where he delivered the money, which appears to be the sole purpose for which he was hired.  Under the totality of the circumstances, there is no evidence to suggest he had any knowledge of, or could have reasonably foreseen, the full scope of the conspiracy beyond the $170,000.

This Court requires a district court to make an individualized determination regarding drug quantity, and not just a conspiracy-wide determination, "concerning the quantity of drugs attributable to, or reasonably foreseeable by, the offender." Cintrón-Echautegui, 604 F.3d at 5 (citing United States v. Colon-Solis, 354 F. 3d 101, 103 (1st Cir. 2004)).  This Court reviews whether the sentencing court made an individualized determination *de novo*, as a question of law.  Cintrón-Echautegui, 604 F.3d at 5; Colon-Solis, 354 F. 3d at 102.

Here, the district court made no individualized determination regarding drug quantity.  The only time the court mentioned quantity was after determining

Appellant's base offense level, stating he "has been held responsible for conspiring to attempt to possess with intent to distribute and aiding and abetting others to attempt to possess with distribute 100 kilograms of cocaine." S.Tr. at 6-7 (S.A. 17-18). When Appellant objected to the total, the district court replied, "Well, that's what you pled guilty to." S.Tr. at 9 (S.A. 20).

Of course, that is **not** what Appellant pleaded guilty to. Instead, he pleaded guilty to the charged conduct, read verbatim by the district court, which was two felony counts involving five or more kilograms of cocaine. See S.Tr. at 6 (S.A. 17). He never admitted to 100 kilos. In fact, he objected to the quantity at his change of plea hearing. P.Tr. at 51 (S.A. 9).[6] Although there is nothing in the PSR Addendum, his counsel stated at the sentencing hearing that he discussed the issue with the Probation Officer. S.Tr. 3 (S.A. 14). During Appellant's allocution, he denied knowledge about any drugs, stating that he had been used by the other defendants. S.Tr. at 5 (S.A. 16). After sentence was pronounced, he firmly stated he had pleaded guilty to his individual conduct regarding the money, and again claimed innocence regarding the drug buy. S.Tr. at 9 (S.A. 20).

Appellant pleaded guilty because he could not have reasonably believed the

---

[6] The government claimed in its brief that Appellant did not object to the quantity finding, Gov't brief, at 26, contradicting both the change of plea hearing transcript and the sentencing hearing transcript.

20

large amount of cash he drove to the parking lot was going to be used for a legal

purpose.  However, his statements to the district court, "I have never spoken about

drugs," S.Tr. at 5 (S.A. 16), and, "I am not going to plead guilty of buying 100

kilos of drugs if I never talk about drugs," S.Tr. at 9 (S.A. 20), strongly imply that

the co-defendants did not talk to him about what they planned to do with the

money.[7]

The district court made no other mention of the money during the hearing.

Although the court briefly cited Appellant's personal circumstances, to fulfill its

obligations under 18 U.S.C. § 3553(a), it did not examine anything specific

regarding Appellant's role in the offense or his relationship to the other defendants.

Compare Cortes-Caban, 691 F. 3d at 27 (in making individualized determination,

sentencing court found total drug quantity was reasonably foreseeable to defendant

who was close to the conspiracy leaders, participated in two acts of planting drugs

---

[7] This is a reasonable inference from the Appellant's statements, considering the
context of the proceedings.  While it is readily apparent from the transcripts that
English is not Appellant's native language, and it was unhelpful that the district
court did not ask him to clarify his remarks, the statements are specific enough for
this Court to draw a conclusion in his favor.  For example, as an adult cab driver in
Puerto Rico it is highly unlikely that Appellant has never spoken about drugs to
another human being.  It is also highly unlikely he would make that claim to a
judge.  However, when examined in the context of this case it becomes more
probable than not that he was telling the district court he never spoke about drugs
with the other defendants.

on others, and did not dispute the total quantity seized).

In its brief, the government tried to dispute Appellant's protestations regarding quantity by disingenuously providing this out-of-context quote: "I tried to buy 100 kilos of drugs. I'd never been in something like this. And they used me." Gov't Brief, at 27 (quoting S.Tr. at 5). The government's ridiculous implication is that Appellant admitted in open court that he (alone, apparently) tried to purchase that very amount. Of course what Appellant said immediately prior to that, "I have never spoken about drugs and I have never spoke about any drugs, and I have never traffic drugs. [sic]. I have not been close to drugs," S.Tr. 5 (S.A. 16), indicates clearly that he was questioning the allegation. He did not state that he "tried to buy 100 kilos of drugs," but rather asked the question, with indignant disbelief at the charge, "I tried to buy 100 kilos of drugs"**[?].** The government, whose representative was in the courtroom at the time, knows full well this was Appellant's intention.

In using the terms "conspiracy" and "aiding and abetting" in its only mention of quantity at sentencing, S.Tr. 6-7 (S.A. 17-18), the district court made a conspiracy-wide determination and not an individual finding specific to the role Appellant actually played, which was limited to the money. By a preponderance of

22

the evidence, no cocaine amount beyond 8.9 kilos was reasonably foreseeable to

Appellant.

B.   APPELLANT PLAYED A MINOR ROLE IN THE CONSPIRACY AND SHOULD
     HAVE BEEN AWARDED A TWO-LEVEL REDUCTION UNDER THE
     SENTENCING GUIDELINES.

Because the cocaine weight which the government made up out of whole

cloth had a crushingly significant impact on Appellant's GSR, as well as made him

susceptible to a mandatory minimum sentence, Appellant asked for a downward

adjustment to compensate for the clearly lesser role he played in the offense, a

request the district court denied.[8]  This Court reviews the court's decision for clear

error.  United States v. Sanchez, 354 F.3d 70, 74 (1st Cir. 2004).

Under the totality of the circumstances a two-level downward adjustment to

Appellant's GSR was warranted.  See Kimbrough v. United States, 128 S. Ct. 558,

564 (2007) (after calculation of the GSR, "judge may determine, however, that, in

the particular case, a within-Guidelines sentence is 'greater than necessary' to

serve the objectives of sentencing.").  Under U.S.S.G. § 3B1.2, a defendant may

receive a deduction for his role in the offense, ranging from a four-point decrease

for a minimal role, § 3B1.2(a), to a two-point decrease for a minor role in the

---

[8] More accurately, the district court ignored the request, as it simply did not include
any role reduction in its rote recital of the GSR calculation.  See S.Tr. 6-7 (S.A. 17-
18).

offense. § 3B1.2(b). A "minimal" role is defined as that of a "peripheral player," while a minor role player is someone who is "not only less culpable than h[is] cohorts in the particular criminal endeavor, but also less culpable than the majority of those within the universe of persons participating in similar crimes." United States v. Morales-Machuca, 546 F.3d 13, 24 (1st Cir. 2008) (citing United States v. Teeter, 257 F.3d 14, 30-31 (1st Cir. 2001)). While Appellant may not have been a minimal participant, his conduct did not fall far outside the classic example of a peripheral player – the so-called "mule" – who does little more than knowingly transport drugs during one leg of the trip.

Appellant met his burden by demonstrating that he qualified for a downward minor role adjustment. United States v. Ocasio, 914 F.2d 330, 332-33 (1st Cir. 1990). His only proven involvement was showing up with the money, making him only slightly more culpable than Decena-Mendieta, whose drug dealing and money laundering made him a named target of the investigation, and who showed up with Hernández-Ubiera to make the cocaine purchase, but was inexplicably let go by the government. On the other hand Appellant was clearly less culpable than either Hernández-Clander or Hernández-Ubiera. See United States v. Martinez-Vargas, 321 F.3d 245, 250 (1st Cir. 2003) (to receive role reduction, defendant must first be less culpable than co-defendants). Both men were known drug

24

dealers and had been under investigation for several weeks prior to arrest. Hernández-Clander negotiated directly with the agents to purchase cocaine, while Hernández-Ubiera resisted arrest by fleeing, tossing three incriminating cells phones and attempting to destroy another one as he ran.

Drug dealers often use financially-strapped individuals to perform simple but risky tasks, such as transporting drugs or money, in exchange for a quick cash payment. By preying on desperation, dealers understand they can induce otherwise law-abiding people into committing a crime. These offenders are not trusted partners in the conspiracy; in fact, they are often at the very "bottom of the hierarchy." United States v. Jurado-Lopez, 338 F. Supp. 2d 246, 252 (D. Mass. 2004). To the dealers, who can easily replace them with others in similar straits, they are "obviously expandable." Id. at 248. Their role is minor by design, as was the case with the defendant in Jurado-Lopez:

> She had no role in setting up the deal, no role in negotiating the price of the drugs, and no knowledge of where the drugs were going. She did not have the name of the person to bring the drugs to; in fact, her co-defendant was the only one who had that information. She was recruited to be the container of drugs purchased, produced and packaged by others. She was selected… exactly because she was vulnerable, had limited knowledge, and could compromise the operation as little as possible.

Id. at 252.

25

A cursory review of Appellant's financial condition – underwater in debt from a money-hemorrhaging taxi business and sinking further each month – reveals a vulnerable man susceptible to exactly the type of illicit proposition this case suggests.[9] His statement to the court, "It's something that they always use in my work," implies that "they," the other defendants, hired him because he was a driver and they wanted him for transportation purposes. Certainly, there was no evidence he intended to actually sell the cocaine or participate in the operation beyond that day. The government presented nothing to contradict Appellant's protestations that he had been used by men who clearly knew what they were doing when they enlisted him to be the money bearer.

As noted elsewhere in this brief, Appellant denied knowledge that he was involved in a cocaine deal. However, even if he had some knowledge that the money would be used for drugs, it would not disqualify him for the reduction. Compare *e.g.*, Santos, 357 F.3d at 142-143 (allowing a two-level adjustment for minor role to transporter despite his knowledge of the operation's scope, and his presence for at least one meeting where the principals discussed quantity of 35 kilos of cocaine and its price of $140,000). There is nothing in the record that

---

[9] Although the government has not maintained the absurd notion that the money Appellant brought to the reverse sting was actually his, it did include a forfeiture order in the indictment, under 21 U.S.C. § 853(p), for $170,113.

shows Appellant participated in the negotiations with the agents, or made statements that belied his limited involvement in the sale.  This places him firmly in the heartland of other defendants who have received this adjustment.  See, e.g., Jurado-Lopez, 338 F. Supp. 2d at 252 (awarding minor role to courier who transported drugs into the United States on multiple trips); United States v. Cabrera, 567 F. Supp. 2d 271, 278 (D. Mass. 2008) (awarding minimal role adjustment to homeless delivery man who knew little or no details about drug operation, but was to be paid between $250-$500 for his effort).

As Appellant received a sentence equitable to the other defendants, and in the case of Hernández-Ubiera the identical sentence, the district court clearly erred in its determination regarding Appellant's role in the offense,  United States v. Rosado-Sierra, 938 F.2d 1, 2 (1st Cir. 1991).  The sentence must be vacated and Appellant resentenced with consideration for this adjustment.

C.    A SENTENCE IN EXCESS OF 12 AND A HALF YEARS FOR A ONE-TIME, NON-VIOLENT OFFENSE OF TRANSPORTING MONEY FOR CONTRABAND IS NOT A JUST PUNISHMENT.

If this Court determines no procedural error was made in determining a defendant's GSR, it then reviews a sentence's substantive reasonableness "for abuse of discretion in light of all circumstances." West, 631 F.3d at 572 (quoting United States v. Rosa-Carino, 615 F.3d 75, 82 (1st Cir. 2010)).  In light of the

totality of the circumstances of this case, a sentence of 151 months is unreasonable, even though it falls within the applicable GSR. See Gall, 552 U.S. at 51. It is also an unjust punishment for the conduct, in opposition to the directives listed at 18 U.S.C. § 3553(a)(2)(A).

This Court has a history of upholding sentences within the advisory guidelines, stating that such terms "require a lesser degree of explanation than those that fall outside the guideline sentencing range," United States v. Turbides-Leonardo, 468 F.3d 34, 41 (1st Cir. 2006), particularly when the sentence is at the GSR's low end. See United States v. Navedo-Concepción, 450 F.3d 54, 57 (1st Cir. 2006). However, a "sentencing court may not mechanically assume that the GSR frames the boundaries of a reasonable sentence in every case." Flores-Machicote, 706 F.3d at 20-21 (quoting Martin, 520 F.3d at 91). The district court clearly made that assumption here, noting that the GSR "satisfactorily reflects the components of the offense by considering its nature and circumstances," S.Tr. 7 (S.A. 18), without further explanation. The court then added it had "considered the other" 3553(a) factors." Id.

Section 3553 requires more, however. The district court erroneously neglected to explain why Appellant's sentence, one which is normally reserved for career offenders, was reasonable, particularly as it fell within a GSR of 151-188

28

months.  See 18 U.S.C. § 3553(c) (providing in pertinent part that if the GSR "exceeds 24 months," the court "shall state in open court ... the reason for imposing a sentence at a particular point within the range.").  Although not expected to "be precise to the point of pedantry…the court ordinarily should identify the main factors on which it relies."  United States v. Arango, 508 F.3d 34, 46 (1st Cir. 2007) (quoting Turbides-Leonardo, 468 F.3d at 40-41).  As noted earlier the main factor, and arguably the only factor, the district court relied upon was that the PSR held Appellant responsible for 100 kilos, a quantity Appellant disputed throughout the case.

Other than noting the GSR was calculated under Criminal History Category I, S.Tr. 7 (S.A. 18), the district court made no mention of Appellant's lack of a criminal record.  While the court may have recited a few of Appellant's personal circumstances, such as his lack of substance abuse or his (relatively) steady employment history, those factors had no impact on the sentence.  Neither did Appellant's age, 48, even though a defendant's age – particularly after 40 – is relevant to the enumerated factor of recidivism.[10]  See 18 U.S.C. § 3553(a)(2)(C)

---

[10] See, e.g., Gall, 128 S.Ct. 586, 601 (2008) (approving use of studies to bolster conclusion that defendant's age supported below-guideline sentence); United States v. Martinez, 2007 WL 593629 (D. Kan. Feb. 21, 2007) (notifying counsel considering non-guideline sentence based, in part, on defendant's age, referencing recidivism reports showing increased age and first offender status show decreased

(sentencing courts "shall consider" the need "to protect the public from further crimes of the defendant").

The explanation requirement of § 3553(c) "furthers the weighty goals of transparency and credibility for the justice system." Arango, 508 F. 3d at 47. "It promotes respect for the adjudicative process, by demonstrating the serious reflection and deliberation that underlies each criminal sentence, and allows for effective appellate oversight." Id. (quoting United States v. Grier, 475 F.3d 556, 572 (3d Cir. 2007) (en banc)). The threadbare explanation here, rising only slightly above nonexistent, cannot be said to demonstrate "serious reflection and deliberation."

While this Court has excused summary explanations, occasionally going "to significant lengths in inferring the reasoning behind, and thus in affirming, some less-than-explicit explanations by district courts, there are limits." United States v. Gilman, 478 F.3d 440, 446 (1st Cir. 2007). If anything can be inferred from the

---

likelihood of recidivism); United States v. Ruiz, 2006 WL 1311982 (S.D.N.Y. May 10, 2006) (noting several courts have imposed non-guideline sentences for defendants over 40 based on markedly reduced recidivism). The U.S. Sentencing Commission noted in 2004 that federal defendants with no criminal history points had a recidivism rate of 11.7 percent, which was approximately half the recidivism rate of defendants who had only one point. See Recidivism and the "First Offender," A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) at 13-14.

district court's summary, it is that the court believed the Probation Office's quantity determination was correct. But that issue was in dispute, and the district court's abdication of its responsibility to decide the matter under the law – as it never did make a formal ruling – cannot be excused. The fact that it neglected to explain why the quantity applied to Appellant individually certainly cannot be excused, as it violates both § 3553(c) and the individualized determination requirement.

In Arango, this Court found that the § 3553(c) requirement was satisfied for a number of reasons, including: the district court conducted a lengthy evidentiary hearing on a key issue; before imposing sentence, the court discussed at length two issues which had been in dispute, and; one defendant received a downward departure while another received the sentence he asked for. Id. at 46-47. This Court also found significant the fact that the defendants did not challenge the reasonableness of their sentences. Id. at 46 ("…they point to no factors the court allegedly over-emphasized or neglected, and do not argue that their sentences are disproportionate to their crimes."). That is not the case here as the district court made no formal findings of fact, did not discuss in any depth the most significant issue in this case, particularly why it believed the 100 kilo quantity was correct as applied to Appellant, and did not credit any other factor as having influenced its

31

decision.  Further, Appellant **is** challenging the reasonableness of this sentence, which cannot be justified under the totality of the circumstances.

The government also played a significant part in this matter, as it made no effort to mitigate the unduly severe effects of the excessive sentence:  An initial plea offer of 70 months, far and away a more appropriate penalty here, was pulled by the government almost immediately after releasing all the discovery, replacing it instead with a ticking clock, raising the offer to 82 months if not accepted within 12 hours; then raising it to 94 months if not accepted within the following 24 hours; and, if not accepted in the 24 hours after that, removing the plea offer entirely.  This high pressure tactic on Appellant and his counsel, who had very little time to examine the evidence and make an informed decision between trial or a plea, may have been legal and within the government's rights but it is more suited to used car sellers than prosecutors who work within a "Department of Justice."  In fact, the government made sure Appellant was denied even the slight relief that would have come from an extra offense level reduction for accepting responsibility, pursuant to U.S.S.G. § 3E1.1(b), even though his plea eliminated the expense of time and resources needed for a trial.

As the federal judge in <u>Holloway v. United States</u>, 01-CV-1017, *slip op.* at 10 (E.D.N.Y. July 25, 2014), noted, the government has a tremendous amount of

power to prevent unduly harsh and unjust sentences in drug cases, but often

chooses to move in the opposite direction:

> [T]he misuse of prosecutorial power over the past 25
> years has resulted in a significant number of federal
> inmates who are serving grotesquely severe sentences,
> including many serving multiple decades and even life
> without parole for narcotics offenses that involved no
> physical injury to others. Even seasoned federal
> prosecutors will agree that many of those sentences were
> (and remain) unjustly severe.

Id.

Appellant acknowledges he did not take the initial plea offer, which was

made before all the discovery had been released, but his counsel continued to

bargain in good faith toward a resolution.  After being "blindsided" by the

government's quick withdrawal of the offer and termination of any further talks,

counsel even tried enlisting the district court's help in renewing plea negotiations.

(S.A. 22).  The wisdom of this strategy, *i.e.*, to try to get the court to influence or

order the government back to the bargaining table, is admittedly debatable but it

did notify the court of the government's conduct and put on record, on the day

before trial was set to commence, that Appellant was not only open to a plea

agreement but had been actively working with the government to negotiate one.

Although this Court regularly upholds denial of the three-level adjustment under §

3E1.1(b) when a plea is entered on the "eve" of trial, see Arango, 508 F.3d at 40-

41; <u>United States v. Donovan</u>, 996 F.2d 1343, 1345 (1st Cir. 1993) (*per curiam*),

the motion indicates Appellant was ready to accept responsibility several days

earlier.

Normally, a defendant who forgoes a plea agreement does so in order to take

a chance at trial. When the trial results in conviction, the difference between what

the defendant would have received under a plea bargain and the sentence he

receives is "sometimes referred to as the 'trial penalty.'" <u>Holloway</u>, 01-CV-1017,

*slip op.* at 4. The penalty Appellant received was 81 months above the

government's original plea offer, which was subsequently revoked. Appellant,

however, did not go to trial. Instead, he pleaded guilty and saved the government

the effort and expense of having to prove his guilt beyond a reasonable doubt

before a jury.

Last year, U.S. Attorney General Eric Holder cited the decision in <u>Alleyne v.</u>

<u>United States</u>, 133 S. Ct. 2151 (2013),[11] as a call to federal prosecutors to avoid

seeking mandatory minimum sentences in cases exactly like this one, in which

there was no violence or weapons, and the defendant was not a leader or organizer,

---

[11] Under <u>Alleyne</u>, a defendant faces a 20 year mandatory minimum only "if the
distribution of drugs is proven beyond a reasonable doubt to a jury to have resulted
in a death." <u>United States v. Pena</u>, 742 F.3d 508, 509 (1st Cir. 2014) (<u>citing</u>
<u>Alleyne</u>, 133 S.Ct. 2158).

had no ties to drug trafficking organizations or cartels, and had a minimal criminal record. The government here, which presumably takes its direction from Mr. Holder's U.S. Department of Justice, apparently has not received the message. In seeking a 151-month sentence, the government apparently believes it knows better than Mr. Holder, the U.S. Sentencing Commission,[12] and the mountain of verified research regarding the ineffectiveness of grotesquely severe drug sentences.

    The district court's action in mechanically applying a 151-month sentence also indicates that the growing consensus against the so-called "War on Drugs" is having little impact in some courtrooms. Appellant is a first time, non-violent offender in his late forties with no history of substance or alcohol abuse, and no mental health problems. This offense was aberrant behavior for him, as he had previously lived a law-abiding life and worked at a legitimate job. His role in the offense was minor, as his participation was limited in scope and very likely temporary. His potential for recidivism appears exceptionally low. The government has presented no credible evidence that dispels any of these assertions.

---

[12] Earlier this year, the Commission reduced the offense levels in the advisory guidelines drug sentencing table at U.S.S.G. § 2D1.1. The action was a continued acknowledgment that Draconian sentences for drug-related offenses are not working. See "U.S. Sentencing Commission Votes to Reduce Drug Trafficking Sentences," (April 10, 2014), http://www.ussc.gov/news. Excessive incarceration creates prison overcrowding, is costly the taxpayers, and does not effectively reduce the rate of crime. See id.

Imprisoning him for 12 and a half years is not defensible, reasonable, or just. The imposed sentence punishes him far longer than is necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

## CONCLUSION

For the reasons above, Appellant's sentence must be vacated and remanded for resentencing.

Respectfully submitted,

**FRANCISCO MERCEDES**,
By his attorneys,

/s/   *George F. Gormley*
George F. Gormley
B.B.O. No. 204140 / App. No. 11595
Stephen P. Super
B.B.O. No. 655943
755 East Broadway
South Boston, MA 02127
(617) 268-2999

Dated: October 10, 2014

36

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## CERTIFICATE OF COMPLIANCE
## WITH RULE 32(a)

### Appeal No. 13-1346

### UNITED STATES OF AMERICA
### Appellee

### v.

### FRANCISCO MERCEDES,
### Defendant-Appellant

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ ✔ ]   this brief contains  7,594  words, excluding the parts of the brief exempted by Fed.R. App. P. 32(a)(7)(B)(iii), *or*

[   ]   this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ✔ ]   this brief has been prepared in a proportionally spaced typeface using _____  Times New Roman  in  14 point  , *or*

[   ]   this brief has been prepared in a monospaced typeface using _____ _____ with _____.

/s/   *George F. Gormley*
**GEORGE F. GORMLEY**

**Dated:**  October 10, 2014

37

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date, I electronically served a copy of the foregoing

document on the following registered participant of the CM/ECF system: AUSA

John A. Mathews II, United States Attorney's Office, Torre Chardon, Suite 1201,

350 Carlos Chardon Ave., San Juan, PR, 00918.


/s/   *George F. Gormley*
George F. Gormley

Dated:  October 10, 2014

38